IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RYLAND GROUP, INC.,                      :

        Plaintiff,                     :

                        Case No. 1:04cv381

        vs.                           :

                      JUDGE WALTER HERBERT RICE

PAYNE FIRM, INC., et al.,                :

        Defendants.                    :

---

DECISION AND ENTRY SUSTAINING IN PART, OVERRULING IN PART
AND OVERRULING, AS MOOT, IN PART PAYNE FIRM DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. #94);
DECISION AND ENTRY OVERRULING IN PART AND OVERRULING, AS
MOOT, IN PART THOMAS DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOC. #95); DECISION AND ENTRY
OVERRULING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT (DOC. #98); DEFENDANT DEANNA RICCIARDI
DISMISSED IN ACCORDANCE WITH RULE 25()(1) OF THE FEDERAL
RULES OF CIVIL PROCEDURE; CONFERENCE CALL SET

---

This litigation arises out of the expenses incurred by Plaintiff Ryland Group,

Inc. ("Plaintiff" or "Ryland"), as a result of the environmental contamination of

approximately 25 acres of land in Butler County, Ohio, known as Lexington Manor.

Ryland developed Lexington Manor as a residential housing development.  After

that development had been completed and houses had been sold, lead was

discovered by one of the residents.  As a consequence, Ryland was required to

repurchase the houses that it had sold and incurred significant expenses cleaning up the development.

The facts and circumstances giving rise to this litigation are not in dispute. In late 1999, Defendant Harry Thomas, Jr. ("Thomas"), purchased Lexington Manor,[1] a 25 acre parcel of real estate located in Butler County, Ohio.[2]  Thomas intended to develop that property into residential lots and to sell the development to Ryland, a residential homebuilding company.  Ryland would then construct houses on the lots which would be sold to consumers.

---

[1]On occasion, this Court will utilize "the property" or "the development," as a synonym for Lexington Manor.

[2]The Plaintiff has also named Harry Thomas a/k/a/ H.T. Investments as a Defendant.  The parties are in agreement that  Harry Thomas a/k/a/ H.T. Investments is a sole proprietorship under which Thomas does business.  See Answers, Counterclaims and Cross-Claims of Defendants the Payne Firm, Inc., John Payne and Donald Fay (Docs. ##18-20) at 17; Plaintiff's Amended Complaint (Doc. #42) at ¶ 9; Thomas Defendants' Answer, Cross-Claims and Third Party Complaint (Doc. #43) at p. 4, ¶ 13; p. 23, ¶ 2.  Given that Harry Thomas a/k/a/ H.T. Investments is a sole proprietorship owned and operated by Thomas, it did not have a legal identity separate from that of its owner, Thomas.  See Patterson v. V & M Auto Body, 63 Ohio St.3d 573, 574-75, 589 N.E.2d 1306, 1308 (1992) (noting that a "sole proprietorship has no legal identity separate from that of the individual who owns it," that "[i]t may do business under a fictitious name if it chooses, but doing business under another name does not create an entity distinct from the person operating the business" and that "[t]he individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations") (internal quotation marks and citation omitted).  Therefore, the Court treats Thomas and his sole proprietorship, Harry Thomas a/k/a/ H.T. Investments, as one Defendant, i.e., the individual Harry Thomas.  To make matters even more clear, the Plaintiff has also named H.T. Investments, Inc., and H.T. Investments, LLC as Defendants herein.  In setting forth the facts and circumstances giving rise to this litigation, the Court has assumed that any mention in the factual record to "H.T. Investments," which is not followed by either "Inc." or "LLC," refers to the sole proprietorship and, thus, to Harry Thomas the individual.

Lexington Manor had previously been used as a recreational gun club, as well as to raise cattle. Its use as a gun club raised the possibility that metal pellets containing lead and arsenic would be distributed throughout its soil. As a consequence, Plaintiff obtained a Phase I environmental site assessment for Lexington Manor from Alt & Witzig Engineering, Inc. ("A&W"). In its assessment, issued December 19, 1999, A&W recommended that a limited Phase II environmental site assessment be conducted to ascertain whether lead was present in the soil. Patrick Moore ("Moore"), an employee of Plaintiff, sent a copy of the Phase I assessment to Thomas, with a covering memorandum, indicating that "Ryland will require certification that the appropriate steps have been taken to address the possible environmental concerns on the site," including the possibility of lead contamination. See Joint Exhibit ("JX") 22 at 0702.[3]

Thereafter, Thomas retained A&W to perform the recommended assessment, in order to determine whether the Lexington Manor site was contaminated with lead. After performing the Phase II assessment, A&W concluded that the lead concentration on that property exceeded 400 ppm, the permissible level for lead contamination of residential property in Ohio. Therefore, the property would need remediation. Nevertheless, Ryland remained interested in purchasing the Lexington Manor property, if the lead contamination could be cleaned up and certification obtained from an environmental consultant indicating that Lexington Manor was suitable for residential development. In order to comply with that requirement,

---

[3]The parties have jointly stipulated to the accuracy of the joint exhibits, which were submitted to the Court in anticipation of the previously scheduled trial. See Doc. #97. When identifying a particular page or pages of a joint exhibit, this Court utilizes the Bates number appearing at the bottom of that page or pages.

Thomas contacted Defendant Payne Firm, Inc. ("Payne Firm"), an environmental consulting firm.

Thomas made contact with the Payne Firm by speaking with Donald Fay ("Fay"), an employee of that entity.  On January 10, 2000, Thomas and Deanna Ricciardi ("Ricciardi"), an employee of his, met with Fay and another employee of the Payne Firm.  The next day, Fay recommended that the Payne Firm be retained to redo A&W's Phase II assessment.  He also indicated that he believed that the Payne Firm could develop a remediation plan for the property, the cost of which would be between $30,000 and $50,000.  On that day, January 11, 2000, Thomas verbally authorized the Payne Firm to re-sample the Lexington Manor property and to prepare a remediation plan for it.  On January 19, 2000, the Payne Firm faxed a number of contract documents to Thomas, including a proposal ("the January 19th proposal"), an Agreement for Professional Services and an Agreement for Professional Services Terms and Conditions ("Terms and Conditions").  See JX 7.  Thomas directed Ricciardi to sign the Agreement for Professional Services and return it to the Payne, which she did.

The Agreement for Professional Services, which is a contract between the Payne Firm and Thomas, provides that the terms of the January 19th Proposal and the Terms and Conditions were part of that Agreement.  Thomas is identified as the Client in that Agreement.  In accordance with the January 19th Proposal, the Payne Firm agreed to hand auger soil from 20 locations on the property, to a depth of between 3 and 24 inches, and to have those samples tested for total lead.  JX 7 at 0520.  The data from the testing would be compared with applicable standards in order to determine whether additional steps had to be taken to allow residential

use of the property.  Id.  In addition, the Payne Firm was required by that proposal

to submit a final report, setting forth its findings and presenting the appropriate

management options and cost estimates.  Id.  The estimated budget for that work

was $5,300.  Id. at 0521.

The Terms and Conditions provide, in pertinent part:

10.    LIMITATIONS OF LIABILITY OF THE PAYNE FIRM

NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT,
TO THE FULLEST EXTENT PERMITTED BY LAW, CLIENT AGREES THAT:

A.    THE TOTAL LIABILITY, IN THE AGGREGATE, OF THE PAYNE FIRM
AND ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SHAREHOLDERS
AND INDEPENDENT CONTRACTORS TO CLIENT, AND ANYONE CLAIMING
BY, THROUGH, OR UNDER, CLIENT, FOR ANY AND ALL INJURIES,
CLAIMS, LOSSES, EXPENSES OR DAMAGES WHATSOEVER ARISING OUT
OF, RESULTING FROM OR IN ANY MANNER RELATING TO THE PROJECT,
THE SERVICES, THE SITE OR THIS AGREEMENT FROM ANY CAUSE OR
CAUSES WHATSOEVER, INCLUDING BUT NOT LIMITED TO THE
NEGLIGENCE, ERRORS, OMISSIONS, STRICT LIABILITY, BREACH OF
CONTRACT, OR BREACH OF WARRANTY OF THE PAYNE FIRM OR ITS
OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SHAREHOLDERS, OR
INDEPENDENT CONTRACTORS, SHALL NOT EXCEED THE TOTAL FEES
RECEIVED BY THE PAYNE FIRM WITH RESPECT TO THE PROJECT, OR
$50,000, WHICHEVER IS GREATER.

B.    NEITHER THE PAYNE FIRM NOR ITS OFFICERS, DIRECTORS,
EMPLOYEES, AGENTS, SHAREHOLDERS, OR INDEPENDENT
CONTRACTORS SHALL BE LIABLE TO THE CLIENT FOR ANY SPECIAL,
INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, WHETHER
CAUSED BY NEGLIGENCE, ERRORS, OMISSIONS, STRICT LIABILITY,
BREACH OF CONTRACT, OR BREACH OF WARRANTY OR OTHER CAUSE
OR CAUSES WHATSOEVER.

11.    INDEMNIFICATION

To the fullest extent permitted by law, Client agrees to defend,
indemnify, and hold The Payne Firm and its agents, subcontractors, and
employees harmless from and against any and all claims, defense costs,
including attorneys' fees, damages, and other liabilities arising out of or in

- 5 -

> any way related to (i) the Services, the Reports, The Payne Firm's
> recommendations, or The Payne Firm's presence on the Site, (ii) the
> presence, releases, or threatened releases of Hazardous Materials on or from
> the Site[,] (iii) the actions or omissions of Client and its agents and
> contractors, including without limitation Client's violation of any law,
> statute, ordinance, or regulation, Client's failure to report a release of
> Hazardous Materials to the appropriate public authority or person, and (iv)
> Client's inability to secure a permit or complete a business transaction for
> any reason, including without limitation unfavorable conditions discovered by
> The Payne Firm; provided that Client shall not indemnify The Payne Firm
> against liability for damages to the extent caused by the gross negligence or
> intentional misconduct of The Payne Firm or its agents or subcontractors.

Id. at 0525 (capitalization in the original).  The Terms and Conditions define the

Site as "the Project Site listed in Section I of the Agreement [for Professional

Services]."  Id. at 0523.  Section I of the Agreement for Professional Services

identifies the Project Site as Fairfield, Ohio.  Id. at 0522.  The January 19th

proposal, which is part of the Agreement for Professional Services, identified the

subject property of that proposal as being on Millikin Road, where Lexington Manor

is located.  Id. at 0520.  In addition, Thomas is identified as the client.  Id. at

0522.

    In accordance with its obligations under the Agreement for Professional

Services, the Payne Firm issued its report on January 28, 2000, setting forth the

results of the re-sampling of Lexington Manor and options for managing the lead

contamination on the property.  See JX 9.  Those options were prefaced with the

statement that proper management of lead contamination in the soil was to reduce

potential future liability and that this could be accomplished by preventing young

children from having access to bare soil areas where the lead concentration

exceeded 400 ppm.  Id. at 0135.  The Payne Firm proposed two soil management

options, to wit: 1) rototilling or cultivating an area of approximately 320 feet by

600 feet;[4] and 2) evacuation of the soil in areas with lead concentrations above 400 ppm and placement of the evacuated soil near the retention pond or the highway, with at least one foot of clean soil placed over the areas that were evacuated.  Id.  If the first option were chosen, it was recommended that a test patch be initially cultivated, so that samples could be taken and the efficacy of that option assessed.  Id.  If the second option were selected, it was stressed that 3,500 cubic yards of contaminated soil would have to be relocated.  Id.  The Payne Firm also emphasized that, whichever option was selected, confirmatory sampling should be conducted after implementation to determine the remaining lead concentrations in areas that could be accessible in the future and that a report be prepared to document site conditions.  Id.  The Payne Firm also warned that care should be taken in managing contaminated soil, in order to prevent it from spreading to other areas.  Id.  In addition, the Payne Firm indicated that adding lime to soil contaminated with lead could stabilize it and reduce its leachability.  Id.

In early February, 2000, Fay and Thomas discussed the need to test the effectiveness of the rototilling option.  Consequently, on February 17, 2000, the Payne Firm sent a second proposal to Thomas (the "February 17th Proposal").  See JX 10.  Therein, the Payne Firm indicated that it would take four, three-inch deep samples from a rototilling test patch by a hand auger, which would be tested for total lead.  Id. at 0517.  If those four samples showed that rototilling was successful, the Payne Firm would take additional such samples at three inches of depth from 15 different locations from the entirety of the area to be rototilled.  Id.

_____

[4]Given that an acre is 4840 square yards, or 43,560 square feet, the area to be rototilled would be about 4.4 acres, less than 20% of the area of Lexington Manor.

In addition, the Payne Firm indicated that it would issue a final report, after it had received the results for the 15 samples.  Thomas accepted the February 17th Proposal, by signing a copy and returning it to the Payne Firm.  Id. at 0518.  That proposal expressly provides that "[t]he signed proposal will extend the terms of the Agreement for Professional Services in place between our firms."  Id.

In March, 2000, Thomas retained Ray Hensley, Inc. ("Hensley"), to perform the rototilling.  Fay told Hensley where and how the test patch was to be rototilled. After the test patch had been rototilled, employees of the Payne Firm collected samples therefrom.  After those samples had been analyzed, Fay advised Thomas that rototilling alone would not be sufficient to remediate Lexington Manor, by reducing the lead concentration below 400 ppm.  As a consequence, it was decided that a combination of the recommendations contained in the report prepared by the Payne Firm on January 28, 2000 (JX 9), i.e., rototilling, treatment with lime and the removal of the more contaminated soil, would be utilized to remediate Lexington Manor.

On April 18, 2000, Ryland and Lexington Manor, Inc. ("LMI"), an entity formed by Thomas, entered into an agreement under which LMI agreed to sell 46 building lots located on Lexington Manor to Ryland.[5]  See JX 35.  Under that agreement, LMI was obligated to provide written confirmation from its environmental consultant, in a form acceptable to Ryland, confirming that "no portion of [the 46 building lots] contains lead contamination and any lead previously located on [those lots] has been removed in accordance with all Legal Requirements ...."  Id. at 7398.  LMI was also obligated by that agreement to

---

[5]LMI had purchased Lexington Manor in March, 2000.

obtain a letter from its environmental consultant, permitting Ryland to rely upon all of its testing and reports.  Id. at 7384.

In mid-March, Fay spoke first with Thomas and then with Thomas and Hensley about adding lime to the soil, in order to stabilize it and to prevent lead from leaching.  Treatment of the soil with lime could cause the treated soil to pass a TCLP test.[6]  Hensley and Thomas agreed that the former would treat approximately three acres of Lexington Manor with lime.  That work commenced in April, 2000.  The Payne Firm told Hensley what portion of Lexington Manor to treat.  On April 26, 2000, Thomas orally requested that the Payne Firm obtain samples from four areas of Lexington Manor to which Hensley had added lime. The Payne Firm orally agreed to perform that work; Thomas and the Payne Firm did not memorialize their agreement in a written contract.  Since one of the four sampled areas passed the TCLP test, further lime treatment was required on only the three areas that had failed to pass that test.

Three times in May, 2000, and on June 1, 2000, Thomas requested that the Payne Firm return to Lexington Manor to collect samples in order to assess the additional lime treatments on the three areas that had failed to pass the TCLP test. During those four instances, the Payne Firm also tested some areas where Hensley had been rototilling.  All of that work was performed by the Payne Firm in accordance with oral contracts into which it had entered with Thomas.  As a result of that testing, the Payne Firm concluded that the additional lime had caused two of the formerly non-compliant areas to pass the TCLP, while the other such area

_____

[6]TCLP is an acronym for Toxic Characteristic Leaching Procedure.  That test was utilized to determine whether lead had leached from the soil of Lexington Manor.

had not.  The Payne Firm also concluded that areas rototilled by Hensley needed to be treated by an alternative method, such as the removal of contaminated soil. The Payne Firm communicated those conclusions to Thomas.

The Payne Firm returned to Lexington Manor on August 8, 2000, in order to conduct confirmatory testing on the areas of that property which had been treated with lime, had been rototilled or from which contaminated soil had been removed. As a result of that testing, the Payne Firm concluded that there were excessive concentrations of lead at five tested locations.  The Payne Firm recommended that soil be removed from those areas.  On August 16, 2000, the Payne Firm tested those five non-compliant areas again, and concluded that only one of them failed to fall below the 400 ppm ceiling.  Additional soil was removed from that area, and on August 24, 2000, the Payne Firm returned to Lexington Manor to retest that one area, where the concentration of lead had previously remained above 400 ppm.  After that test, the Payne Firm opined that this area had also become compliant (i.e., the concentration of lead was below 400 ppm).  The Payne Firm performed the work at Lexington Manor during August, 2000, in accordance with oral contracts with Thomas.

On September 8, 2000, the Payne Firm submitted its final report to Thomas, stating that Lexington Manor was "suitable for residential development."  JX 12 at 0109.  That same date, the Payne Firm sent a letter to Ryland, indicating that the latter could rely on the report it had submitted to Thomas on that date (JX 12), but that such reliance would be "subject to the terms and conditions of the Service Agreement, to the same extent as if you were the Client thereunder."  JX 13.

Thomas paid the Payne Firm $16,123, for all of the work it performed at Lexington Manor.[7]

After Plaintiff had built residences on 42 of the 46 building lots at Lexington Manor and had sold those houses, the residents of one such discovered lead contamination.  As a consequence, Ryland repurchased all of the residences and removed substantial lead contamination therefrom, which resulted in it incurring substantial damages.

Ryland brings this litigation to recover damages from two groups of Defendants, to wit: Thomas and certain related parties, HT Investments, LLC, and H.T. Investments, Inc. (collectively "Thomas Defendants");[8] and the Payne Firm, John Payne and Fay (collectively "Payne Firm Defendants").  In its Amended Complaint (Doc. #42), Plaintiff sets forth eight claims for relief, to wit: 1) a claim against the Payne Firm, Fay and Thomas for response costs and/or contribution under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, et seq. ("First Claim for Relief");[9] 2) a claim against

---

[7]Ryland paid it nothing.

[8]Plaintiff also set forth claims in its Amended Complaint against Ricciardi, who is alleged to have assisted Thomas in his business dealings.  See Doc. #42 at ¶ 10. On May 8, 2007, the Thomas Defendants filed a suggestion of Ricciardi's death, in accordance with Rule 25(a)(1) of the Federal Rules of Civil Procedure.  See Doc. #105.  Under Rule 25(a)(1), a decedent must be dismissed from an action, if no party has moved to substitute the decedent's representative within 90 days of service of a suggestion of death.  Since more than 90 days have passed since the Thomas Defendants filed the suggestion of death and no party has moved to substitute her personal representative, the Court dismisses her from this litigation, thus extinguishing the Plaintiff's claims and the cross-claims of Defendants Payne Firm (Doc. #18), John Payne (Doc. #19) and Donald Fay (Doc. #20) against her.

[9]Plaintiff's First Claim for Relief, not unlike Gaul, is divided into three parts, to wit: a claim for response costs, alleging that the Payne Firm, Fay and Thomas were

those Defendants under § 3746.23 of the Ohio Revised Code ("Second Claim for

Relief"); 3) a claim of fraud against all Defendants ("Third Claim for Relief"); 4) a

claim of promissory estoppel against all Defendants ("Fourth Claim for Relief"); 5) a

claim of civil conspiracy against all Defendants ("Fifth Claim for Relief"); 6) a claim

of negligent misrepresentation against all Defendants ("Sixth Claim for Relief"); 7)

a claim of negligence against all Defendants ("Seventh Claim for Relief"); and 8) a

claim of common law indemnity against all Defendants ("Eighth Claim for Relief").

Each of the three Payne Firm Defendants, the Payne Firm, John Payne and

Fay, has filed identical Answers, Counterclaims and Cross-Claims, wherein each

sets forth counterclaims against Plaintiff and cross-claims against Thomas.[10]  See

Docs. ##18-20.[11]  In those pleadings, the Payne Firm Defendants have set forth

eight claims for relief, to wit: 1) a claim for contribution under § 113(f) of CERCLA,

42 U.S.C. § 9613(f) against Plaintiff and Thomas ("First Claim for Relief"); 2) a

claim for common law indemnity against Plaintiff and Thomas ("Second Claim for

Relief"); 3) a claim for contribution under §§ 2307.31 and 2307.32 of the Ohio

Revised Code against Plaintiff and Thomas ("Third Claim for Relief"); 4) a claim for

declaratory judgment against Plaintiff ("Fourth Claim for Relief"); 5) a claim of

---

operators under § 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2); a claim for
response costs, alleging that the Payne Firm, Fay and Thomas were arrangers
under § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3); and a claim for contribution
against those Defendants under § 113(f)(3)(B) of CERCLA, 42 U.S.C.
§ 9613(f)(3)(B).

[10]Therein, the Payne Firm Defendants have not set forth claims against HT
Investments, LLC, and/or H.T. Investments, Inc.

[11]In response to the Plaintiffs' Amended Complaint (Doc. #42), the Payne Firm
Defendants submitted a Stipulation (Doc. #45), executed by all parties, indicating
that their previously filed Answers, Counterclaims and Cross-Claims (Docs. ##18-
20) remain effective.

breach of contract against Thomas ("Fifth Claim for Relief"); 6) a claim of contractual indemnity against Plaintiff and Thomas ("Sixth Claim for Relief"); 7) a claim of fraud against Thomas ("Seventh Claim for Relief"); and 8) a claim of negligent misrepresentation against Thomas ("Eighth Claim for Relief). In addition, the Payne Firm has filed a Reply to Thomas' cross-claims against the Payne Firm, wherein it has set forth a claim for declaratory relief against Thomas ("Ninth Claim for Relief"). See Doc. #25 at 9-10.

Thomas, in turn, has set forth claims against the Payne Firm in his Answer, Cross-Claims and Third-Party Complaint (Doc. #43), to wit: 1) a claim of contribution under § 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1) ("First Claim for Relief"); 2) a common law claim of indemnification ("Second Claim for Relief"); 3) a common law claim for contribution ("Third Claim for Relief"); 4)a claim of promissory estoppel ("Fourth Claim for Relief"); 5) a claim of fraud ("Fifth Claim for Relief"); 6) a claim of negligent misrepresentation ("Sixth Claim for Relief"); and 7) a claim of negligence ("Seventh Claim for Relief").

This litigation is now before the Court on the parties' cross motions for partial summary judgment. See Doc. #94 (Payne Firm Defendants' Motion for Partial Summary Judgment); Doc. #95 (Thomas Defendants' Motion for Partial Summary Judgment); and Doc. #98 (Ryland's Motion for Partial Summary Judgment). As a means of analysis, the Court will initially set forth the procedural standards it must apply whenever it rules on a motion seeking summary judgment, partial or otherwise, following which it will turn to the parties' arguments in support of and in opposition to the three requests for partial summary judgment filed herein.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323.  See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial."  Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995).  Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50).  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff.").  Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  Celotex Corp., 477 U.S. at 324.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment shall be denied "[i]f there are … 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party.  Anderson, 477 U.S. at 255 (emphasis added).  If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder.  10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726.  In ruling on a

motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990).  See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment …."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

In their Motion for Partial Summary Judgment (Doc. #94), the Payne Firm Defendants seek summary judgment on the following claims, to wit: 1) their counterclaims and cross-claims for declaratory judgment and contractual indemnification against Plaintiff and the Thomas Defendants; and 2) the Plaintiff's and the Thomas Defendants' claims of negligence and negligent misrepresentation.[12]  To support these requests for summary judgment, the Payne

---

[12]As an initial matter, it bears emphasis that none of the Payne Firm Defendants has asserted a claims against either HT Investments, LLC, or H.T. Investments, Inc., nor has either of those Defendants asserted a claim against any of the Payne Firm Defendants.  Therefore, the Court overrules, as moot, the aspects of the Payne Firm Defendants' motion which is directed at claims asserted by HT Investments, LLC, or H.T. Investments, Inc.  The Court also overrules, as moot, the portions of that motion directed at claims against Ricciardi, given that she has

Defendants present a number of arguments, focusing primarily on the applicability of the limitation of liability and the indemnification clauses contained in the Terms and Conditions, which are quoted above, and the question of whether the economic loss rule prevents the imposition of liability on them for negligence or negligent misrepresentation.

In their Motion for Partial Summary Judgment, the Thomas Defendants' request summary judgment on the Fifth, Sixth, Seventh and Eighth Claims for Relief in each of the Payne Firm Defendants' Cross-Claims (Docs. ##18-20).[13] See Doc. #95 at 1. In addition, the Thomas Defendants contend that they are entitled to summary judgment on the Twenty-First Defense and Ninth Claim for Relief in the Payne Firm's Reply and Additional Cross-Claims (Doc. #25). Id. With the Fifth, Sixth, Seventh and Eighth Claims for Relief, the Payne Firm Defendants have set forth, respectively, claims of breach of contract, contractual indemnity, fraud and negligent misrepresentation against Thomas. See Docs. ##18-20. With the Ninth Claim for Relief, the Payne Firm had set forth a request for declaratory relief against Thomas. See Doc. #25 at 9-10. With the Twenty-First Defense, the Payne Firm alleges that the claims of Thomas are barred by a contract between the parties. Id. at 6. In their motion, the Thomas Defendants do not separately address any of the elements of the foregoing claims or the Twenty-First Defense.

_____

been dismissed from this litigation. See Footnote 8, supra.

[13]The Court overrules the Thomas Defendants' Motion for Partial Summary Judgment (Doc. #95), as moot, to the extent that, with it, those Defendants seek partial summary judgment on behalf of Deanna Ricciardi, given that this Court has ordered her dismissed from this litigation, pursuant to Rule 25(a)(1). It also overrules as moot, the aspect of that motion with which H.T. Investments, LLC, and H.T. Investments, Inc., seek summary judgment, given that none of the Payne Firm Defendants has asserted a claim against either of those Defendants.

- **17** -

Rather, they base their request for summary judgment on two propositions, to wit: 1) the Terms and Conditions do not apply to the oral contracts between Thomas and the Payne Firm Defendants; and 2) even if the Terms and Conditions are applicable, the limitation of liability and indemnification clauses contained therein are unenforceable.

In its Motion for Partial Summary Judgment, Ryland seeks summary judgment on the following issues, to wit: 1) that there was no contract between itself and the Payne Firm; 2) that, even if such a contract existed, the indemnification and limitation of liability contract are inapplicable and unenforceable; and 3) that, even without a contract, the Payne Firm owed it a duty of reasonable care.  See Doc. #98 at 2.

In ruling on the three motions seeking partial summary judgment, this Court, as a means of analysis, will initially address the arguments raised by the parties relating to the applicability of the limitation of liability and indemnification clauses, following which it will turn to their contentions concerning the Payne Firm Defendants' liability for claims of negligence and/or negligent misrepresentation.


I.  Motions for Summary Judgment as They Relate to Payne Firm Defendants' Claims for Declaratory Judgment, Breach of Contract and Contractual Indemnity

As is indicated, the Payne Firm Defendants have set forth in their Fourth, Fifth and Sixth Claims for Relief, respectively, claims for declaratory judgment against Plaintiff, for breach of contract against Thomas and for contractual indemnity against Plaintiff and Thomas.  In addition, with their Ninth Claim for Relief, the Payne Defendants have set forth a claim for declaratory relief against

Thomas, while they allege in their Twenty-First Defense that Thomas' claims are barred by the contract between the parties. Plaintiff, the Payne Defendants and the Thomas Defendants seek summary judgment on some or all of the issues raised by those claims and that defense. These requests for summary judgment raise the overarching questions relating to the limitation of liability and indemnification clauses, which are set forth in the Terms and Conditions. The Thomas Defendants seek summary judgment on the issues of whether those clauses are applicable to the work the Payne Firm performed pursuant to its oral contracts with Thomas, and, if so, whether those two clauses are enforceable. Ryland requests summary judgment on the issues of whether it had a contractual relationship with the Payne Firm and, if such a contract existed, whether the indemnification and limitation of liability provisions are applicable and enforceable. The Payne Firm Defendants, in turn, have requested summary judgment on the issues of whether the limitation of liability and indemnity clauses in the Terms and Conditions are valid and enforceable. The Payne Firm Defendants also seek summary judgment on the question of whether those two clauses apply to all the work they performed at Lexington Manor, both that which was done in accordance with their written agreements with Thomas and that which was performed pursuant to oral agreements with him. In addition, the Payne Firm Defendants seek summary judgment on the issue of whether those two clauses are applicable to the claims the Plaintiff has set forth against them herein. As a means of analysis, this Court will initially address together the arguments of the Plaintiff and the Thomas Defendants that the indemnification and limitation of liability clauses are not valid and enforceable, under Ohio law. The Court will then discuss separately the

Plaintiff's and the Thomas Defendants' arguments as to why those clause are not applicable to the claims herein.

A.  Indemnification and Limitation of Liability Clauses

Both Plaintiff and the Thomas Defendants contend that the indemnification and limitation of liability clauses are not valid or enforceable.  As a means of analysis, the Court will discuss the parties' arguments concerning the two clauses in the above order.

1.  Indemnification Clause

In Worth v. Aetna Cas. & Sur. Co., 32 Ohio St.3d 238, 241, 513 N.E.2d 253, 257 (1987), the Ohio Supreme Court reiterated that indemnification agreements are generally enforceable under Ohio law, except in certain limited circumstances.  Both the Plaintiff and the Thomas Defendants attack the validity and enforceability of the indemnity clause herein, arguing that it is rendered unenforceable by § 2305.31 of the Ohio Revised Code, one of the limited circumstances recognized by the Worth court, where such a provision will not be enforced.  Section 2305.31 provides:

> A covenant, promise, agreement, or understanding in, or in connection with or collateral to, a contract or agreement relative to the design, planning, construction, alteration, repair, or maintenance of a building, structure, highway, road, appurtenance, and appliance, including moving, demolition, and excavating connected therewith, pursuant to which contract or agreement the promisee, or its independent contractors, agents or employees has hired the promisor to perform work, purporting to indemnify the promisee, its independent contractors, agents, employees, or indemnitees against liability for damages arising out of bodily injury to persons or damage to property initiated or proximately caused by or resulting from the negligence of the promisee, its independent contractors, agents,

employees, or indemnitees is against public policy and is void.  Nothing in this section shall prohibit any person from purchasing insurance from an insurance company authorized to do business in the state of Ohio for his own protection or from purchasing a construction bond.

In response, the Payne Defendants initially argue that § 2305.31 is not applicable, because that statute would only void a contractual provision under which they were required to indemnify the Plaintiff or the Thomas Defendants from the negligence of the latter.  See Doc. #100 at 16-17.  This Court agrees.  Section 2305.31 applies to contracts and agreements with which "the promisee, or its independent contractors, agents or employees has hired the promisor to perform work."  Herein, the Payne Firm, the promisee, was hired by Thomas, the promisor, to perform work on behalf of the latter.  Since the Payne Defendants did not hire either the Thomas Defendants or the Plaintiff to perform work, the contracts involved in this litigation do not implicate § 2305.31.

Nevertheless, Plaintiff (Doc. #98 at 11-12) and the Thomas Defendants (Doc. #95 at 24-25) argue that this Court is required to construe § 2305.31 liberally and in a manner in which furthers the public policy behind it, to wit: to make parties to construction contracts responsible for their own negligence.  Since such an interpretation of § 2305.31 would violate fundamental principles of statutory construction under Ohio law, this Court cannot accept their invitation.  In Davis v. Davis, 115 Ohio St.3d 180, 873 N.E.2d 1305 (2007), the Ohio Supreme Court restated those principles:

Legislative intent controls our analysis.  In State ex rel. Russo v. McDonnell, 110 Ohio St.3d 144, 150,, 852 N.E.2d 145, we stated, "'In construing a statute, our paramount concern is legislative intent.'"  Id., quoting State ex rel. Musial v. N. Olmsted, 106 Ohio St.3d 459, 835 N.E.2d 1243.  We further stated that "[i]n order to determine this intent, we must '"read words and phrases in context according to the rules of grammar and

> common usage."'" Id., quoting <u>State ex rel. Cincinnati Bell Tel. Co. v. Pub.</u>
> <u>Util. Comm.</u>, 105 Ohio St.3d 177, 824 N.E.2d 68, quoting <u>State ex rel. Lee</u>
> <u>v. Karnes</u>, 103 Ohio St.3d 559, 817 N.E.2d 76; <u>see</u>, <u>also</u>, R.C. 1.42.
>
>            *          *          *
>
>      Furthermore, in <u>State v. Lowe</u>, 112 Ohio St.3d 507, 861 N.E.2d 512,
> we affirmed that "a court may not add words to an unambiguous statute,
> but must apply the statute as written." Id., citing <u>Portage Cty. Bd. of</u>
> <u>Commrs. v. Akron</u>, 109 Ohio St.3d 106, 846 N.E.2d 478; <u>see</u>, <u>also</u>,
> <u>Columbus-Suburban Coach Lines, Inc. v. Pub. Util. Comm.</u> (1969), 20 Ohio
> St.2d 125, 127, 254 N.E.2d 8 ("it is the duty of this court to give effect to
> the words used, not to delete words used or to insert words not used").
> And as this court stated in <u>Iddings v. Jefferson Cty. School Dist. Bd. of Edn.</u>
> (1951), 155 Ohio St. 287, 290, 98 N.E.2d 827, "[t]o construe or interpret
> what is already plain is not interpretation but legislation, which is not the
> function of the courts." <u>See</u>, <u>also</u>, <u>Barth v. Barth</u>, 113 Ohio St.3d 27, 862
> N.E.2d 496; <u>Lake Hosp. Sys., Inc. v. Ohio Ins. Guar. Assn.</u> (1994), 69 Ohio
> St.3d 521, 524, 634 N.E.2d 611; and <u>Thompson Elec., Inc. v. Bank One,</u>
> <u>Akron, N.A. (1988)</u>, 37 Ohio St.3d 259, 264, 525 N.E.2d 761.

Id. at 183-84, N.E.2d at 1308-09. Simply stated, in order adopt the construction

proposed by Plaintiff and the Thomas Defendants, this Court would be required to

alter the plain, unambiguous language utilized by the Ohio General Assembly in

§ 2305.31, in order to make that statute applicable to construction related

contracts under which the promisee has <u>not</u> hired the promisor to perform work.

As the Ohio Supreme Court indicated in <u>Davis</u>, courts are not permitted to engage

in such legislating in the name of statutory construction.

     Accordingly, this Court concludes that the indemnification clause in the

Terms and Conditions is not rendered inapplicable by § 2305.31.

## 2. Limitation of Liability Clause

     The Thomas Defendants and Ryland present a number of arguments as to

why the limitation of liability clause is unenforceable. Initially, they argue that the

clause is an unenforceable penalty provision.  See Doc. #95 at 21-24; Doc. #98 at 12-13.  In Samson Sales, Inc. v. Honeywell, Inc., 12 Ohio St.3d 27, 465 N.E.2d 392 (1984), the Ohio Supreme Court addressed a limitation of liability provision in a contract by which the defendant provided a burglar alarm system to the plaintiff. The Samson Sales court set forth the following proposition of law in the syllabus:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.  (Jones v. Stevens, 112 Ohio St. 43, 146 N.E. 894 (1925), paragraph two of the syllabus, followed.)

Id., 465 N.E.2d at 392-93.  Therein, the plaintiff had paid $1,500 to have the burglar alarm installed.  In addition, the plaintiff was required to pay $150 per month, for a period of 5 years, so that the defendant would provide service for the alarm system (i.e., call the police department in the event that the alarm went off). The contract, however, limited the plaintiff's recovery, in the event of a failure of defendant to perform to $50.00.  The plaintiff suffered a loss of in excess of $68,000, as a result of a burglary, the occurrence of which the defendant was alleged to have failed to inform the local police department.  The Ohio Supreme Court concluded that the limitation of liability clause was an unenforceable penalty, rather than being a liquidated damages provision because, inter alia, "the stated sum of $50 in the contract involved in this case is manifestly disproportionate to either the consideration paid by [plaintiff] or the possible damage that reasonably could be foreseen from the failure of [defendant] to notify the police of the

burglary." Id. at 29, 465 N.E.2d at 394. It bears emphasis that the limitation of liability clause herein provides for the payment of the greater of the amount paid to the Payne Firm or $50,000. See JX 7 at 0525. Thomas paid the Payne Firm $16,123, for all of the work that it performed at Lexington Manor. In the absence of authority in support of the proposition that a clause limiting liability to more than three times the amount paid to the party seeking such a limitation constitutes an unenforceable penalty, this Court concludes, as a matter of law, that the limitation of liability provision herein is not such a penalty.

The Thomas Defendants and Ryland also argue that the limitation of liability clause is unenforceable, because it violates public policy. In Collins v. Click Camera & Video, 86 Ohio App.3d 826, 621 N.E.2d 1294 (1993), a decision relied upon by both the Thomas Defendants and the Payne Firm Defendants, the plaintiff gave 28 reels of film to the defendant, to be converted to videotape. In placing his order, the plaintiff signed a customer receipt, which limited the defendant's liability to providing replacement roles of undeveloped film. The plaintiff brought suit, after the defendant had lost the reels of film, arguing, inter alia, that the limitation of liability violated public policy. The trial court, rejected that assertion and granted summary judgment in favor of the defendant. Upon appeal, the Montgomery County Court of Appeals affirmed. As an initial matter, that court noted that, while exculpatory clauses such as the limitation of liability provision are disfavored in the law, they will be upheld absent public policy concerns or unconscionability, given the overriding role of freedom of contract. Id. at 832, 621 N.E.2d at 1298 (citing Royal Indemn. Co. v. Baker Protective Services, Inc., 33 Ohio App.3d 184, 515 N.E.2d 5 (1986) for the proposition that "the freedom of contract is fundamental and absent some overwhelming public policy, courts will not disrupt

- 24 -

the allocation of risk embodied in contractual relationships").  See also, Dorsey v.

Contemporary Obstetrics & Gynecology, Inc., 113 Ohio App.3d 75, 80, 680

N.E.2d 240, 243 (1996) (observing that "Ohio courts have held the concept of

'freedom of contract' to be fundamental to our society," in the absence of an

unconscionable contract).  The Collins court then explored the factors which are

applied by courts to determine whether a contractual provision violates public

policy:

> In determining whether an exculpatory provision is void as against
> public policy, courts have considered, inter alia, whether the goods or
> services contracted for are necessary for a person's living needs; whether
> the supplier assumes a quasi-public function in providing the goods; whether
> the supplier has been granted a monopoly in providing a specific service; and
> whether the limitation provision is such that the customer is in a position to
> assent to its terms.  See Berjian [v. Ohio Bell Tel. Co., 54 Ohio St.2d 147,
> 154-57, 375 N.E.2d 410, 414-15 (1978)]; Orlett [v. Suburban Propane, 54
> Ohio App.3d 127, 129, 561 N.E.2d 1066, 1069 (1989)]; Carr [v. Hoosier
> Photo Supplies, Inc., 441 N.E.2d 450 (Ind.1982)].

86 Ohio App.3d at 832, 621 N.E.2d at 1298.  The Collins court noted that the

plaintiff had argued only that the fourth of the four applicable factors rendered the

exculpatory clause violative of public policy and relied upon decisions in which

Ohio courts had held that exculpatory language on the back of a ticket received at

a parking lot did not effectively limit the liability of the parking lot owner, because

such tickets are merely a token for identification and do not give the customer the

ability to assent to their terms.  Id. at 833, 621 N.E.2d at 1298.  In contrast, the

plaintiff in Collins had been given the opportunity to assent, by signing the

customer receipt.  Id., 621 N.E.2d at 1298-99.  Accordingly, the Collins court

concluded that the exculpatory provision did not violate public policy.

Herein, none of the four applicable factors identified in Collins causes this

Court to conclude that the limitation of liability and/or indemnification clauses

violate public policy. Providing environmental services to a developer is hardly necessary to a person's living needs. In addition, although environmental contaminants are extensively and technically regulated under both federal and state law, the Thomas Defendants have cited no authority that an entity operating under such regulation, such as the Payne Firm, provides a quasi-public service, merely because it operates in a heavily regulated area of commerce. Thirdly, there is no indication that the Payne Firm enjoys a monopoly on environmental consulting. On the contrary, Ryland employed a different environmental consultant, A&W, before Thomas retained the Payne Firm. Lastly, the Thomas Defendants and Ryland were afforded the opportunity of assenting to the limitation of liability and indemnification clauses, given that the Agreement for Professional Services was sent to them for a signature.

Accordingly, this Court rejects the assertion of Ryland and the Thomas Defendants that the limitation of liability clause is unenforceable as violative of public policy.[14]

The Thomas Defendants also contend that the limitation of liability and indemnification clauses are unenforceable, because they are unconscionable. Ohio courts have recognized that a contractual provision is not unconscionable, unless it is both procedurally and substantively so. For instance, in Peltz v. Moyer, 2007 WL 2758604 (Ohio App. 2007), the court wrote:

> Unconscionability has been further defined as the absence of a meaningful choice (procedural unconscionability) in addition to presentation of contract terms that are unreasonably favorable to one side (substantive unconscionability). Collins v. Click Camera & Video, Inc. (1993), 86 Ohio

---

[14]Without arguing the question separately, the Thomas Defendants contend that the indemnification clause is also unenforceable because it violates public policy. Based upon the above reasoning, this Court rejects that assertion.

App.3d 826, 834, 621 N.E.2d 1294.  A court must find both procedural and substantive unconscionability in order to invalidate [a contractual provision].

Id. at *5.  Accord, Martin v. Byke, 2007 WL 4442738 (Ohio App. 2007); Carl v. Thomas & King, 2006 WL 1629740 (Ohio App. 2006); Collins, supra; Scovill v. WSYX/ABC, 425 F.3d 1012, 1017 (6th Cir. 2005) (applying Ohio law).

Herein, without considering the question of whether the limitation of liability and indemnification clauses are substantively unconscionable, this Court concludes that the evidence fails to raise a genuine issue of material fact as to whether either of those provisions is procedurally unconscionable.  In Collins, the leading case on unconscionability under Ohio law, the Montgomery County Court of Appeals explained when a contractual provision is procedurally unconscionable:

> Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, e.g., "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question."  Johnson v. Mobil Oil Corp. (E.D.Mich. 1976), 415 F. Supp. 264, 268.

86 Ohio App.3d at 834, 621 N.E.2d  at 1399.  Herein, the factors listed in Collins, other than the fact that the clauses were drafted by the Payne Firm, favor the conclusion that the two challenged clauses are not procedurally unconscionable. The Thomas Defendants have cited no authority for the proposition that a contractual provision is procedurally unconscionable merely because one of the parties to the contract drafted it.  On the contrary, even though the exculpatory clause at issue in Collins had been drafted by the defendant, the court concluded that it was not procedurally unconscionable, because the plaintiff, a graduate of Harvard, had substantial business experience and there was no evidence that he

could not have gone elsewhere to obtain the services he had sought from the defendant.  Similarly, Thomas is a sophisticated real estate developer.  Moreover, there is no indication that Thomas could not have altered the Terms and Conditions, or if the Payne Firm would not consent to such an alteration, retained a different environmental consultant.

Based upon the foregoing, this Court concludes that both the indemnification and limitation of liability clauses are enforceable.  Accordingly, the Court sustains the Payne Firm Defendants' Motion for Partial Summary Judgment (Doc. #94), as it relates to the question of whether those clauses are enforceable under the law of Ohio, and overrules those of the Thomas Defendants (Doc. #95) and Ryland (Doc. #98), as they relate to that issue.

The conclusion that the limitation of liability and indemnification clauses are enforceable does not, however, resolve the question of whether those clauses apply to the Payne Firm Defendants' actions for which the Plaintiff and Thomas seek to impose liability.  As a means of analysis, this Court will initially address the Plaintiff's arguments as to why those two contractual provisions do not apply to the claims between itself and the Payne Defendants, following which it will turn to the Thomas Defendants' arguments concerning the applicability of same to the claims between themselves and the Payne Defendants.

B.  Applicability of the Limitation of Liability and Indemnification Clauses to Claims Between Plaintiff and the Payne Defendants

On September 8, 2000, the Payne Firm submitted its final report to Thomas, stating that Lexington Manor was "suitable for residential development."  JX 12 at

0109.  That same date, the Payne Firm sent a letter to Ryland, indicating that the latter could rely on the report it had submitted to Thomas on that date (JX 12), but that such reliance would be "subject to the terms and conditions of the Service Agreement, to the same extent as if you were the Client thereunder."  JX 13.  The Payne Firm Defendants argue that this letter to Plaintiff was an offer, which the latter accepted, thus forming a binding contract between the parties.  The Payne Firm Defendants contend further that, as a result, the Plaintiff is bound by the limitation of liability and indemnification clauses set forth the Terms and Conditions which are part of the January 19th Agreement for Professional Services between the Payne Firm and Thomas.  Plaintiff, in contrast, contends that the Terms and Conditions do not apply to it, because an express or implied contract between itself and the Payne Firm, including such clauses, did not exist.[15]  The Plaintiff supports that proposition with three separate arguments, to wit: 1) the September 8th letter sent to it by the Payne Firm did not constitute an offer; 2) if that letter did constitute an offer, Plaintiff did not accept that offer; and 3) that there was not a meeting of the minds between the parties.  As a means of analysis, the Court will address those three arguments in the above order.

_____

[15]In Legros v. Tarr, 44 Ohio St.3d 1, 540 N.E.2d 257 (1989), the Ohio Supreme Court distinguished between express contracts and those implied in fact:
> In express contracts the assent to its terms is actually expressed in offer and acceptance.  In [a] contract implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which made it inferable that the contract exists as a matter of tacit understanding.

Id. at 6-7, 540 N.E.2d at 263 (internal quotation marks and citations omitted). Herein, it is not necessary to decide whether an implied contract existed between the Plaintiff and the Payne Firm, since this Court concludes below that an express contract existed between them.

1. Offer

Ohio courts have defined an offer as "'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Motorists Mutual Ins. v. Columbus Financial, Inc., 168 Ohio App.3d 691, 695-96, 861 N.E.2d 605, 608 (2006) (quoting Reedy v. Cincinnati Bengals, Inc., 143 Ohio App.3d 516, 521, 758 N.E.2d 678, 682 (2001)).[16] Herein, the Payne Defendants contend that the letter from the Payne Firm to Ryland, under date of September 8, 2000, constitutes such a manifestation.[17] For reasons which follow, this Court agrees.

The text of that letter provides, in its entirety:

> We have been requested to state that The Ryland Group, Inc. may rely on The Payne Firm, Inc.,['s] September 8, 2000 Lead in Soil Evaluation Results, Lexington Manor, Liberty Township, Ohio ("Report"). Subject to the last paragraph of this letter, the undersigned hereby agrees to this request and allows The Ryland Group, Inc. to rely on the Report to the same extent as if it were an original addressee thereof.
>
> The Report was made pursuant to a certain Environmental Services Agreement Terms and Conditions between The Payne Firm, Inc. and H.T. Investments, Inc. (the "Service Agreement"). The Ryland Group's reliance on the Report is subject to the terms and conditions of the Service Agreement, to the same extent as if you were the Client thereunder.

---

[16]In Reedy, the court quoted Garrison v. Daytonian Hotel, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316, 1318 (1995), which, in turn, quoted § 24 of the Restatement, 2d, of Contracts.

[17]To support its contention that it did not enter into a contract with the Payne Firm, Plaintiff has cited paragraph 15 of the Uncontested Issues of Fact, in the parties Proposed Final Pretrial Order (Doc. #85). Therein, it is stipulated that, except for the September 8th letter (JX 13), "Payne did not have any direct communication with Ryland related to Lexington Manor prior to the discovery of lead impacted soil on Lot 32 at said site in October 2002." Doc. #85 at 7. As a consequence of that stipulation, any contract between the Plaintiff and the Payne Firm must be predicated upon that letter. That said, however, the stipulation does not answer the question of whether the Payne Firm's letter to Plaintiff became a contract between the parties.

JX 13.  The language of that communication can be interpreted in no manner other than a manifestation of willingness by the Payne Firm to enter into a bargain with Plaintiff, under which the latter could rely upon the final report it had sent to Thomas, in exchange for the Plaintiff's agreement to be bound by the terms and conditions of "a certain Environmental Services Agreement ... between The Payne Firm, Inc. and H.T. Investments, Inc."

Nevertheless, the Plaintiff argues that this letter did not constitute an offer, because no "bargaining" occurred between itself and the Payne Firm.[18]  To the extent that the Plaintiff contends that the alleged lack of bargaining means that any contract between itself and the Payne Firm was not supported by consideration, this Court cannot agree.  In Lake Land Emp. Group of Akron, LLC v. Columber, 101 Ohio St.3d 242, 804 N.E.2d 27 (2004), the Ohio Supreme Court noted that consideration is a predicate to the formation of a contract and defined it as "the bargained-for legal benefit or detriment."  Id. at 246, 804 N.E.2d at 31.  Herein, the September 8th letter identified the benefit flowing to the Plaintiff as its right to rely upon the Payne Firm's September 8th report.  The Payne Firm would, in turn, receive Plaintiff's promise to be bound by the terms and conditions of "a certain Environmental Services Agreement ... between The Payne Firm, Inc. and H.T. Investments, Inc."

Moreover, to the extent that the Plaintiff predicates its proposition that there was a lack of bargaining between itself and the Payne Firm on the uncontradicted

---

[18]Plaintiff also argues that the September 8th letter did not constitute an offer, because it should not have realized that its assent to a contract was invited by that letter.  This Court cannot agree.  That communication clearly invites the Plaintiff to rely upon the September 8th report by the Payne Firm, in exchange for the promise of the former to be bound by certain terms and conditions.  See Restatement, 2d, of Contracts § 1.

fact that the two did not have direct contact before or after the Payne Firm furnished the September 8th letter, this Court cannot agree. The decision of the Franklin County Court of Appeals in Lee v. C.D.E. Home Inspection Co., Inc., 2002 WL 1938248 (Ohio App. 2002), arose under similar factual circumstances. Therein, that court concluded that the parties had entered into a contract, even though they had not directly communicated before the defendant had submitted the writing that was alleged to have constituted their agreement. After the plaintiffs had entered into a contract to purchase a house, which was contingent upon the house passing an inspection, their real estate agent recommended that they utilize the defendant to perform the inspection and, on their behalf, arranged for defendant to do so. Before beginning the inspection, the defendant had no direct contact with the plaintiffs. The terms and conditions of the defendant's inspection report included a provision that limited the defendant's liability to the amount of the fee charged for the inspection. The plaintiffs utilized the report to negotiate further with the sellers of the house. The appellate court held that the terms and conditions of the inspection report were part of the contract between the plaintiffs and the defendant, even though they had not directly communicated before that report was issued. Similarly, herein, this Court concludes that the September 8th letter constituted an offer, despite the lack of direct communication between Plaintiff and the Payne Firm before that letter was issued.

In addition, Plaintiff argues that the September 8th letter did not constitute an offer, because it was merely a form letter, which the Payne Firm routinely issued in real estate transactions, and that such letters are commonplace in the real estate industry to facilitate closings. Although the evidence supports the factual predicates of this argument (see Deposition of John Payne at 109, 148, 152-53),

this Court cannot agree with the Plaintiff that the Payne Firm's routine use of what it agrees is a form letter means that the September 8th letter was not an offer. Forms are frequently used in commercial settings and become contracts.  Plaintiff essentially suggests that this Court hold that a routinely utilized form cannot constitute an offer.  Given that such a holding would be contrary to recognized commercial practices, this Court declines the Plaintiff's suggestion in that regard.

Finally, Plaintiff argues that the September 8th letter did not constitute an offer, because its terms were not definite and certain.[19]  The second paragraph of that letter provides that the Payne Firm's report to Thomas that same date "was made pursuant to a certain "Environmental Services Agreement Terms and Conditions between The Payne Firm, Inc. and H.T. Investments, Inc. (the 'Service Agreement')" and that Ryland's "reliance on the Report is subject to the terms and conditions of the Service Agreement."  JX 13.  Plaintiff points out that the Payne Firm and the Thomas Defendants did not enter into an agreement entitled "Environmental Services Agreement Terms and Conditions" or "Environmental Services Agreement."  On the contrary, the Terms and Conditions are appended to the written agreement, between Payne Firm and the Thomas Defendants entered, which is captioned "Agreement for Professional Services."

According to the Plaintiff, the Payne Firm's September 8th letter lacked definiteness and certainty, because the agreement to which the Terms and Conditions are appended was misidentified therein.  Under the uncontroverted

---

[19]In Reedy v. Cincinnati Bengals, Inc., 143 Ohio App.3d 516, 758 N.E.2d 678 (2001), the court noted that "the essential terms of the contract, usually contained in the offer, must be definite and certain."  Id. at 521, 758 N.E.2d at 682.  Based upon the foregoing statement in Reedy, this Court assumes, for present purposes, that an offer must be definite and certain.

facts of this dispute, however, this Court cannot agree.  There is no indication that

the Plaintiff was ever uncertain that the "Environmental Services Agreement Terms

and Conditions between The Payne Firm, Inc. and H.T. Investments, Inc." was the

January 19th agreement between those two entities, even though that agreement

is entitled "Agreement for Professional Services," instead of being called the

"Environmental Services Agreement Terms and Conditions between The Payne

Firm, Inc. and H.T. Investments, Inc."  The Plaintiff did not seek to obtain a copy

of any agreement between the Payne Firm and the Thomas Defendants, until

October, 2002, after lead had been discovered on one of the properties of

Lexington Manor.[20]  At that point, the Plaintiff was able to obtain a copy of the

January 19th Agreement for Professional Services from the Thomas Defendants.

The Plaintiff has not pointed to any evidence which suggests that anyone was

confused that the document mentioned in the September 8th letter was the

agreement into which the Payne Firm and the Thomas Defendants entered on

January 19, 2000.

Based upon the foregoing, this Court concludes that the Payne Firm's letter

to Ryland, under date of September 8, 2000, constituted an offer.


2.  Acceptance

As indicated, Plaintiff also argues that, even if the letter constituted an offer,

it did not by its silence accept that offer.  This Court does not agree.  In Berjian v.

Ohio Bell Telephone Co., 54 Ohio St.2d 147,375 N.E.2d 410 (1978), the Ohio

_____

[20]Plaintiff did not attempt to obtain a copy of any agreement between the Payne
Firm and the Thomas Defendants, when the Payne Firm sent the September 8th
letter.

- **34** -

Supreme Court addressed the issue of whether an offer can be accepted through the offeree's silence. Therein, the plaintiff had brought an action against the defendant, seeking to recover damages as a result of the defendant's failure to place his advertisement in the yellow pages of its telephone directory. After plaintiff's office manager had ordered the advertisement, a representative of the defendant sent a directory advertising agreement to plaintiff, under which its liability for errors in placing advertisements was limited to the amount paid for the advertising. Before determining the enforceability of the limitation of liability provision, the Ohio Supreme Court addressed the question of whether the directory advertising agreement was applicable to the plaintiff, since he had not indicated his acceptance of same by signing it. The Ohio Supreme Court noted that, although a an offeror cannot normally cause an offeree to accept a contract through its silence, the plaintiff's silence did constitute an acceptance therein. Id. at 152, 375 N.E.2d at 414. In support thereof, the Ohio Supreme Court cited, inter alia, § 69 of the Restatement, 2d, of Contracts,[21] which provides, in pertinent part:

> (1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:
>> (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.
>> (b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.
>> (c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

---

[21]In actuality, the Ohio Supreme Court cited § 72 of the Tentative Draft Nos. 1-7 for the Restatement, 2d, of Contracts. Section 72 of the Tentative Draft became § 69 of the final version. See Blazavich v. CNA Ins. Cos., 1998 WL 353870 (Ohio App. 1998) at *5.

In <u>Leader Personnel, Inc. v. Bernard, Haffey & Bosco Co.</u>, 1984 WL 5548 (Ohio

App. 1984), the Cuyahoga County Court of Appeals concluded that, in accordance

with § 69(1)(a) of the Restatement, 2d, of Contracts, the defendant had accepted

the terms contained in the plaintiff's proposal letter, thus entering into a contract,

by taking advantage of the benefits of the contract and failing to express

disagreement with the terms of the agreement.  <u>Id</u>. at *2.

Similarly, herein, the Plaintiff sought and received the reliance letter from the

Payne Firm and, thereafter, relied upon it in order to close on the purchase of

Lexington Manor with the Thomas Defendants.  The express language of that letter

demonstrates that the right to rely was being offered in exchange for the

agreement of the Plaintiff to be bound by the Terms and Conditions.  Although

Plaintiff had an ample opportunity to reject the Payne Firm's offer and, thus, to

decline to rely upon the latter's final report to the Thomas Defendants, it (Plaintiff)

did not do so.

Based upon the foregoing, this Court concludes that the evidence fails to

raise a genuine issue of material fact, tending to demonstrate that the Plaintiff did

not, by its silence, accept the offer in the Payne Firm's September 8th letter.


3.  Meeting of the Minds

Thirdly, Plaintiff argues that there was not a meeting of the minds between

the parties.  Courts in Ohio have frequently held that a meeting of the minds is a

necessary predicate to the formation of a contract.  See <u>e</u>.<u>g</u>., <u>Kostelnik v. Helper</u>,

96 Ohio St.3d 1, 3-4, 770 N.E.2d 58, 61 (2002) <u>Ruli v. Fan Co.</u>, 79 Ohio St.3d

374, 376, 683 N.E.2d 337, 338-39 (1997); <u>Episcopal Ritirement Homes, Inc. v.</u>

<u>Ohio Dept. of Industrial Relations</u>, 61 Ohio St.3d 366, 369, 575 N.E.2d 134, 137

(1991); <u>Noroski v. Fallet</u>, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302, 1304 (1982). In <u>Legros v. Tarr</u>, 44 Ohio St.3d 1, 540 N.E.2d 257 (1989), however, the Ohio Supreme Court explained that a meeting of the minds is generally manifested in an express contract by an offer and an acceptance. <u>Id</u>. at 7, 540 N.E.2d at 263. If this Court were to follow <u>Legros</u>, therefore, the question of whether there was a meeting of the minds would be no different than that of whether there was an offer by the Payne Firm and an acceptance by the Plaintiff. However, given the frequency with which Ohio courts have stated that a meeting of the minds is a necessary predicate to the existence of a contract, it will address the Plaintiff's assertion that such did not occur herein.

The Plaintiff argues that there was not a meeting of the minds, because the Payne Firm did not make an offer which it accepted. <u>See</u> Doc. #98 at 9. For the reasons set forth above, this Court rejects that assertion and concludes that the evidence fails to raise a genuine issue of material fact, demonstrating that the Plaintiff and the Payne Firm did not have a meeting of the minds, given that the Payne Firm made an offer which the Plaintiff accepted.

Based upon the foregoing, this Court concludes that the uncontroverted evidence establishes that the Payne Firm and the Plaintiff entered into a contract, under which the latter became bound by the Terms and Conditions appended to the Payne Firm's January 19th Proposal to the Thomas Defendants. Accordingly, this Court sustains the Payne Firm Defendants' Motion for Partial Summary Judgment (Doc. #94) and overrules the Plaintiff's Motion for Partial Summary Judgment (Doc. #98), as they relate to that question.

C.  Applicability of the Limitation of Liability and Indemnification Clauses to Claims
Between Thomas Defendants and the Payne Defendants

Turning to the claims between the Thomas Defendants and the Payne
Defendants, the limitation of liability and indemnification clauses are, as a matter of
contract law, applicable to the January 19th and the February 17th agreements.
The Terms and Conditions, in which those two clauses are located, were part of
the January 19th Agreement for Professional Services and incorporated into the
latter agreement.  The parties do not dispute that premise.[22]  The Thomas
Defendants argue that the Terms and Conditions and the two clauses therein are
not part of their oral agreements with the Payne Firm concerning the work
performed at the Lexington Manor, after the services provided for in the two
written agreements had been completed.  The Payne Firms Defendants are, not
surprisingly, of the opposite opinion.  For reasons which follow, this Court agrees
with the Thomas Defendants.

As an initial matter, there is no evidence before the Court that, when any
one or more or all of the oral contracts were formed, anyone acting for or
associated with any of the Payne Firm Defendants or the Thomas Defendants
mentioned the Terms and Conditions, let alone indicated that they were applicable
to the oral contracts.  Nevertheless, based upon language contained in the January
19th Agreement for Professional Services and the Terms and Conditions attached
thereto, the Payne Firm Defendants argue that the latter are applicable to the oral
agreements.  See Doc. #94 at 9.  Those Defendants initially point out that the
Agreement for Professional Services identified the proposal as the January 19th

_____

[22]The Thomas Defendants contend, however, that neither of those clauses is
enforceable under Ohio law.  This Court has rejected that assertion above.

Proposal.  JX 7 at 0520 and 0522.  In addition, as is indicated, that agreement incorporates by reference the Terms and Conditions, which are appended thereto. Id. at 0522.  The Terms and Conditions, in turn, define "proposal" as that "described in the Agreement and any additional Proposal made by The Payne Firm and accepted by the Client."  Id. at 0523.  The Payne Defendants argue that the Terms and Conditions do not require that a proposal be in writing and point to other provisions in the Terms and Conditions, which require that certain other matters, such as termination (Section 12 of the Terms and Conditions) or modification (Section 19 of the Terms and Conditions) be in writing.  Id. at 0525-26.  The Thomas Defendants, in contrast, argue that the Terms and Conditions apply only to services in written proposals.  Those Defendants base that assertion on Section 19 of the Terms and Conditions, which is applicable to modifications of the Agreement for Professional Services.  Section 19 provides, in pertinent part, that "[n]o amendment or modification to this Agreement … shall be effective unless in writing, signed by both parties, and references this paragraph by heading and number."  Id. at 0526.  The Thomas Defendants point out that the Agreement for Professional Services explicitly identifies the Proposal, by both the number given it by the Payne Firm and the date, as the January 19th Proposal.  Compare Id. at 0522 (Agreement for Professional Services), with id. at 0520 (January 19th Proposal).  Moreover, as the Thomas Defendants point out, the Agreement for Professional Services provides that the January 19th Proposal is part of that Agreement.  For reasons which follow, this Court concludes that the Thomas Defendants proposed construction of the pertinent document is faithful to the language utilized therein.  Accordingly, the Court rejects the Payne Firm Defendants' assertion that the Terms and Conditions apply to the services provided

in accordance with the oral agreements between the parties, subsequent to its performance of the work called for by the January 19th proposal and the February 17th proposal. The Court begins by reviewing the applicable standards for contract construction under the law of Ohio.[23]

The interpretation of a contract is a matter law. Ignazio v. Clear Channel Broadcasting, Inc., 113 Ohio St.3d 276, 280, 865 N.E.2d 18, 21-22 (2007). In City of St. Mary's v. Auglaize County Bd. of Commissioners, 115 Ohio St.3d 387, 390, 875 N.E.2d 561, 566 (2007), the Ohio Supreme Court reiterated that the function of courts in interpreting a contract is to ascertain the parties' intent. That intent is presumed to reside in the language the parties have chosen to utilize in their agreement and extrinsic evidence may be considered only when the contract is ambiguous. Graham v. Drydock Coal Co., 76 Ohio St.3d 311, 313-14, 667 N.E.2d 949, 951 (1996).

Herein, the contract between the Thomas Defendants and the Payne Firm clearly and unambiguously provides that modifications must be in writing. Therefore, the question becomes whether the oral contracts into which those entities entered after February 17, 2000, were modifications of the Agreement for Professional Services. As indicated, the Payne Firm Defendants contend that those

_____

[23]Parenthetically, even if this Court were to agree with the Payne Firm Defendants' proposed interpretation of the Agreement for Professional Services, it would have denied their request for summary judgment, because there is, at a minimum, a genuine issue of material fact as to whether any one or more or all of the oral contracts arose out of a proposal by the Payne Firm which was accepted by the Thomas Defendants. For instance, in its letter to counsel for the Thomas Defendants on February 12, 2003, setting forth what it had done, the Payne Firm described the work performed at Lexington Manor under the oral contracts, as occurring as a result of it being requested to return to the Lexington Manor, rather than performing those services, because it made a proposal that the Thomas Defendants accepted. JX 74 at 0277-78.

oral contracts are part of that Agreement, because they come within the definition given to the word "proposal" by the Terms and Conditions. Accepting that proposition for present purposes,[24] this Court concludes that such oral contracts purported to modify the existing Agreement for Professional Services. The Agreement for Professional Services indicates that the client (the Thomas Defendants) seeks to engage the Payne Firm to perform the work defined in the Proposal. JX 7 at 0522. The Proposal has been identified therein by its number, 11135, and its date, January 19, 2000. Id. The number and date correspond with the number and date of the January 19th Proposal (see id. at 0520), meaning that the Agreement for Professional Services covered the work identified in that Proposal. It is uncontroverted that the Payne Firm was engaged to perform different tasks by the oral contracts. See JX 74. Therefore, those oral contracts would modify the services which that Agreement indicates the Payne Firm would perform and, consequently, are purported modifications of same. Since the oral contracts were not in writing, they could not modify that Agreement. In other words, the parties' undertakings in accordance with those oral contracts did not become part of the Agreement for Professional Services, rendering the Terms and Conditions inapplicable to those contracts.

---

[24]If the Payne Firm Defendants' assertion that the oral contracts are "proposals," as that word is defined by the Terms and Conditions, is not correct, then there is no basis for concluding that the Terms and Conditions apply to those oral contracts.

Accordingly, the Court accepts the proposition of the Thomas Defendants that the Terms and Conditions are not part of the oral contracts between the parties and rejects the contrary assertion by the Payne Firm Defendants.[25]

Nevertheless, the Payne Firm Defendants argue that the <u>limitation of liability and indemnification clauses are made applicable to the oral contracts</u> by the broad language of those two contractual provisions.[26]  In particular, the Payne Firm Defendants point out that the limitation of liability clause applies to "ANY AND ALL INJURIES, CLAIMS, LOSSES, EXPENSES OR DAMAGES WHATSOEVER ARISING OUT OF, <u>RESULTING FROM OR IN ANY MANNER RELATING</u> THE PROJECT, THE SERVICES, <u>THE SITE</u> OR THIS AGREEMENT FROM ANY CAUSE OR CAUSES WHATSOEVER."  JX 7 at 0525 (capitalization in the original and emphasis added). The indemnification clause, in turn, applies to all claims "arising out of or in any way related to," <u>inter alia</u>, "the presence, releases, or threatened releases of Hazardous Materials on or from the Site."  <u>Id</u>.  According to the Payne Firm, all of its actions, for which the Thomas Defendants are attempting to impose liability

---

[25]The Payne Firm Defendants argue that the parties' course of performance demonstrates that the Terms and Conditions were part of their oral contracts.  This Court cannot agree.  Under Ohio law, the course of performance of a contract (other than one for the sale of goods, governed by Article 2 of the Uniform Commercial Code, Chapter 1302 of the Ohio Revised Code) cannot be utilized as an aid to interpretation, unless the contract is ambiguous.  <u>Cincinnati Ins. Co. v. ACE INA Holdings, Inc.</u>, 2007 WL 3036671 (Ohio App. 2007) at *5 ("When an ambiguity [in a contract] exists, the court may consider the parties' course of performance in determining their intent.") (footnote omitted); <u>Manor Care, Inc. v. First Specialty Ins. Corp.</u>, 2006 WL 2010782 (N.D.Ohio 2006) (holding that, under Ohio law, course of performance cannot be utilized to interpret a contract, unless that agreement is ambiguous).  Herein, since there is no ambiguity in the Agreement for Professional Services, this Court cannot look to the parties' course of performance in order to construe that Agreement.

[26]It is uncontroverted that the Terms and Conditions are part of the Agreement for Professional Services.

upon it, come within that broad language utilized in the two clauses. For reasons which follow, this Court agrees.[27]

As an initial matter, both of those clauses apply to all claims relating to the "Site." It is not questioned that Lexington Manner is the "Site" upon which the Payne Firm performed its services for the Thomas Defendants. The Agreement for Professional Services refers to the site as "Fairfield, Ohio." In addition, the indemnification clause applies to all claims which are "arising out of or in any way related to," inter alia, "the presence, releases, or threatened releases of Hazardous Materials on or from the Site." The limitation of liability clause, in turn, applies to all claims "RESULTING FROM OR IN ANY MANNER RELATING" the Site (i.e., Lexington Manor). It could not be questioned that the liability which the Thomas Defendants are attempting to impose upon the Payne Firm arises out of, is related to or results from Lexington Manor and the presence of lead (a hazardous material) thereon.

Based upon the foregoing, the Court sustains the Payne Firm Defendants' Motion for Partial Summary Judgment (Doc. #94) and overrules that filed by the Thomas Defendants (Doc. #95), as they relate to the applicability of the limitation of liability and indemnification clauses to the claims between the Payne Firm Defendants and the Thomas Defendants.

---

[27]Thus, although this Court has not found that the Terms and Conditions, which include the limitation of liability and indemnification clauses, are part of the oral contracts, it does conclude that the language of those two clauses makes them applicable to those oral contracts.

II.  Claims of Ryland and the Thomas Defendants for Negligent Misrepresentation
and Negligence

 Both the Plaintiff, in its Amended Complaint (Doc. #42), and the Thomas
Defendants, in their Cross Claim (Doc. #43), have set forth claims of negligent
misrepresentation and negligence against the Payne Firm.  The Plaintiff, but not the
Thomas Defendants, has also set forth such claims against Fay and John Payne.[28]
The Payne Firm Defendants have moved for summary judgment on these claims,
arguing that those claims are barred by the economic loss rule.[29]  In support of that
assertion, the Payne Firm Defendants rely upon the decision of the Ohio Supreme
Court in Corporex Dev. & Constr. Mtg., Inc. v. Shook, Inc., 106 Ohio St.3d 412,
835 N.E.2d 701 (2005).  Therein, the owner of an under construction motel,
Dublin Suites, Inc. ("DSI"), and the general contractor on that project brought suit
against a subcontractor, Shook, setting forth claims for breach of contract, breach
of express warranty, breach of implied warranty, negligence and failure to perform
in a workmanlike manner.  The plaintiffs sought to recover the economic damages
allegedly caused by Shook's failure to perform under the subcontract.  Shook
moved for and was granted judgment on the pleadings on DSI's claims, on the
basis of the economic loss rule.  After the trial court had entered final judgment in
favor of Shook and against DSI, in accordance with Rule 54(B) of the Ohio Rules of

_____

[28]Throughout this portion of its Decision, the Court addresses the parties'
arguments as if both the Plaintiff and the Thomas Defendants had asserted their
negligence and negligent misrepresentation claims against each of the Payne Firm
Defendants, even though only the Plaintiff has asserted such claims against Fay
and John Payne.

[29]Ryland argues that, even though it did not have a contractual relationship with
the Payne Firm, the latter owed it a duty of reasonable care.  Given that this Court
has concluded above that such a relationship existed, it is not necessary to address
that hypothetical argument.

Civil Procedure,[30] the latter appealed. The Franklin County Court of Appeals reversed as to DSI's negligence claim, concluding that this claim came within an exception to the economic loss rule. Shook appealed to the Ohio Supreme Court, which reversed the reinstatement of the negligence claim. As an initial matter, the Corporex court explained the economic loss rule:

> The economic-loss rule generally prevents recovery in tort of damages for purely economic loss. See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co. (1989), 42 Ohio St.3d 40, 45, 537 N.E.2d 624; Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn. (1990), 54 Ohio St.3d 1, 3, 560 N.E.2d 206. "'[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.'" Chemtrol, 42 Ohio St.3d at 44, 537 N.E.2d 624, quoting Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp. (Iowa 1984), 345 N.W.2d 124, 126. See, also, Floor Craft, 54 Ohio St.3d at 3, 560 N.E.2d 206. This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that "parties to a commercial transaction should remain free to govern their own affairs." Chemtrol, 42 Ohio St.3d at 42, 537 N.E.2d 624. See, also, Floor Craft, 54 Ohio St.3d at 7, 560 N.E.2d 206, quoting Sensenbrenner v. Rust, Orling & Neale Architects, Inc. (1988), 236 Va. 419, 425, 374 S.E.2d 55. "'Tort law is not designed … to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.'" Floor Craft, 54 Ohio St.3d at 7, 560 N.E.2d 206, quoting Sensenbrenner, 236 Va. at 425, 374 S.E.2d 55.

Id. at 414, 835 N.E.2d at 704. In applying the economic loss rule therein, to conclude that DSI did not have a valid negligence claims against Shook, the Corporex court explained:

---

[30]The claims of the contractor against Shook remained pending. In its decision, the Ohio Supreme Court did not indicate how those claims had been resolved or even if they had been.

Like DSI's, the appellate court's privity analysis misconstrues our prior holdings.  The assertions of both the appellate court and DSI ignore the reality underlying liability for purely economic loss.  In addition to generally recognized duties in tort, such as the one in Haddon View [Invest. Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 436 N.E.2d 212 (1982)], privity or a sufficient nexus that could serve as a substitute for privity may impose only those contractual duties and liability for breach of those duties agreed to by the parties to the contract, and no more.  When a duty in tort exists, a party may recover in tort.  When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract.  "'Protection against economic losses caused by another's failure properly to perform is but one provision the contractor may require in striking his bargain.  Any duty … in this regard is purely a creature of contract'" and can only be enforced by a party to that contract.  Floor Craft, 54 Ohio St.3d at 4, 560 N.E.2d 206, quoting Blake Constr. Co., Inc. v. Alley (1987), 233 Va. 31, 35, 353 S.E.2d 724.

Because the underlying duties are created by a contract to which DSI is not a party, no tort action lies in DSI's favor.  Instead, DSI, the project owner, retains its right to file a breach-of-contract claim against Corporex, the contractor, for damages permitted under its contract, and Corporex may, in turn, recover any damages against Shook, the subcontractor, permitted by the subcontract.  DSI may not, however, recover in tort when Shook has no duty in tort to protect DSI from purely economic damages.  See Chemtrol, 42 Ohio St.3d at 45, 537 N.E.2d 624; Floor Craft, 54 Ohio St.3d at 3, 560 N.E.2d 206.  We will not adopt a rule that ignores basic tort law and thwarts the intentions of parties to a contract, who must be allowed to bargain freely to allocate the risks attendant to their undertaking, including the possibility of purely economic damages.

Id. at 415-16, 835 N.E.2d at 705.

In Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn., 54 Ohio St.3d 1, 560 N.E.2d 206 (1990), one of the Ohio decisions cited in the initial passage from Corporex quoted above, a contractor on a renovation project at the defendant hospital brought suit against, inter alia, the architect for the project, alleging that the architect had negligently provided a type of flooring and sealant, in the plans and specifications for the project, which was incompatible with the construction methods used in the project.  After the trial and intermediate appellate

- 46 -

courts had concluded that the architect was entitled to judgment on that claim, the contractor/plaintiff obtained further review by the Ohio Supreme Court. That court affirmed, holding in the syllabus that "[i]n the absence of privity of contract no cause of action exists in tort to recover economic damages against design professionals involved in drafting plans and specifications."

In Chemtrol Adhesives, Inc. v. Am. Manufacturers Mut. Ins. Co., 42 Ohio St.3d 40, 537 N.E.2d 624 (1989), the other Ohio decision cited in the initial passage quoted from Corporex, the Ohio Supreme Court addressed the subrogation claims of negligence and strict liability in tort by the insurer of the purchaser of a commercial machine against the machine's manufacturer. The Ohio Supreme Court concluded that those claims were not viable, since the insurance company was seeking to recover solely for the economic loss suffered by its insured, rather than for personal injury or damage to other property. The Chemtrol Adhesives court held, in ¶ 2 of the syllabus:

> 2.      A commercial buyer seeking recovery from the seller for economic losses resulting from damage to the defective product itself may maintain a contract action for breach of warranty under the Uniform Commercial Code; however, in the absence of injury to persons or damage to other property, the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence.

Id., 537 N.E.2d at 626.

Nevertheless, the Plaintiff and the Thomas Defendants argue that liability for negligence and negligent misrepresentation can be imposed upon the Payne Firm Defendants in accordance with § 552 of the Restatement, 2d, of Torts, given that the Ohio Supreme Court has recognized such claims under that provision in the Restatement. The Payne Firm Defendants, in contrast, contend that such liability cannot be imposed.

Section 552, which is captioned "Information Negligently Supplied For The

Guidance Of Others," provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

In Haddon View Invest. Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 436 N.E.2d

212 (1982), the Ohio Supreme Court relied, inter alia, on § 552 and held in the

syllabus that "[a]n accountant may be held liable by a third party for professional

negligence when that third party is a member of a limited class whose reliance on

the accountant's representation is specifically foreseen."  In Corporex, the Ohio

Supreme Court explained its holding in Haddon View:

> DSI misconstrues our holding in Haddon View.  In Haddon View, this court discussed the liability of an accountant for professional negligence in accord with 3 Restatement of the Law 2d, Torts (1979), Section 552. Haddon View, 70 Ohio St.2d at 156, 436 N.E.2d 212.  That section recognizes professional liability, and thus a duty in tort, only in those limited circumstances in which a person, in the course of business, negligently supplies false information, knowing that the recipient either intends to rely on it in business, or knowing that the recipient intends to pass the information on to a foreseen third party or limited class of third persons who intend to rely on it in business.  Restatement of Torts 2d, 126-127, Section

552. Liability in Haddon View was based exclusively upon this discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity. Haddon View, 70 Ohio St.2d at 156-157, 436 N.E.2d 212. DSI fails to identify any duty in tort analogous to the duty identified in Haddon View. Its reliance on Haddon View, therefore, is misplaced.

106 Ohio St.3d at 415, 835 N.E.2d at 704-05.[31]

Based upon Corporex and the other Ohio Supreme Court decisions discussed above, this Court, concludes that the economic loss rule prevents the Plaintiff and/or the Thomas Defendants from recovering on their negligence claims (as opposed to their negligent misrepresentation claims) from any of the Payne Firm Defendants. Simply stated, in none of those decisions did the Ohio Supreme Court hold that a party can recover damages in a negligence action for an economic injury, alone. On the contrary, the Ohio Supreme Court indicated in Corporex that recovery for an economic injury is limited to a breach of contract action, when the negligence claim is predicated on the failure to perform duties imposed by a contract. The negligence claims against the Payne Firm Defendants herein are predicated upon the failure of the Payne Firm to perform its oral contracts with the Thomas Defendants.

Based upon the authority which is discussed above, this Court concludes that, in accordance with § 552, liability can be imposed on the Payne Firm for

---

[31]The Payne Firm Defendants argue that liability cannot be imposed for negligent misrepresentation, because the Ohio Supreme Court has limited the applicability of § 552 to accountants. Although some intermediate appellate courts have indicated that Haddon View and § 552 are limited to accountants (see e.g., Trustcorp Mortgage Co. v. Zajac, 2006 WL 3690299 (Ohio App. 2006), the Ohio Supreme Court has not so intimated. On the contrary, in the above-quoted passage from Corporex, the Ohio Supreme Court wrote that Haddon View and § 552 apply to professionals generally, rather than accountants alone.

negligent misrepresentation.[32]  The Plaintiff and the Thomas Defendants contend that the Payne Firm, in the course of its profession as an environmental consultant, negligently supplied false information (i.e., that Lexington Manor was "suitable for development," see JX 12 at 0109) in its final report to the Thomas Defendants, dated September 8, 2000.  Moreover, it cannot be questioned that the Plaintiff and the Thomas Defendants were persons for whose benefit and guidance the Payne Firm intended to supply that information to the Thomas Defendants and the Plaintiff, given that the final report is addressed to the former and the Payne Firm expressly stated that the Plaintiff could rely upon it.

The Payne Firm does not contest the foregoing.  Rather, it contends that it is nevertheless entitled to summary judgment, because the evidence fails to raise a genuine issue of material fact as to the element of reliance.  In support of that argument, the Payne Firm relies upon Foster Wheeler Environsponse, Inc. v. Franklin County Convention Facilities Authority, 83 Ohio St.3d 353, 366, 678 N.E.2d 519, 529 (1997).  Therein, the Ohio Supreme Court held that, regardless of whether the plaintiff had a valid claim for negligent misrepresentation, it could not establish reliance, one of the essential elements of such a claim, because the contract in question contained a disclaimer putting the plaintiff on notice not to rely upon the alleged misrepresentation.  Herein, since the Payne Firm has not pointed to a similar disclaimer, this Court concludes that Foster Wheeler does not mandate to grant of summary judgment in favor of the Payne Firm on the negligent misrepresentation claims of the Plaintiff and the Thomas Defendants.

---

[32]Whether liability under § 552 can also be imposed on Fay and John Payne is discussed below.

Fay and John Payne argue that they are entitled to summary judgment on the Plaintiff's negligent misrepresentation claim, because John Payne merely signed the reliance letter, in a representative capacity on behalf of the Payne Firm, and Fay merely signed the final report on behalf of the Payne Firm in that capacity. Those two Defendants also point out that, under Ohio law, liability cannot be imposed an employee, officer or shareholder of a corporation, other than under a piercing the corporate veil theory. In response, the Plaintiff argues that liability can be imposed upon employees, officers and shareholders of a corporation for personally engaging in tortious activity in the scope of their employment. See Doc. #102 at 14-15. As a means of analysis, the Court initially addresses the question of whether such liability can be imposed upon John Payne.

Since the economic loss rule prevents the Plaintiff from recovering from either John Payne or Fay under a negligence theory, tort liability can be imposed on John Payne only under a negligent misrepresentation theory. Plaintiff predicates its claim of negligent misrepresentation against John Payne on the fact that, on behalf of the Payne Firm, he signed the September 8, 2000, reliance letter. See Doc. #102 at 14-15. The Plaintiff has not identified a falsehood in that letter. On the contrary, that letter accurately states that the Plaintiff can rely upon the Payne Firm's final report, in exchange for its reliance being subject to the Terms and Conditions. It is axiomatic that an essential element of a claim of negligent misrepresentation is that the defendant has "suppl[ied] false information." Delman v. Cleveland Heights, 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (1989); Krukrubo v. Fifth Third Bank, 2007 WL 4532689 (Ohio App. 2007) *6. Herein, in the absence of false information in the September 8th letter which John Payne signed on behalf of the Payne Firm, he cannot be held liable for making a negligent

misrepresentation.  Therefore, he is entitled to summary judgment on Plaintiff's claim of negligent misrepresentation.

The Plaintiff predicates its negligent misrepresentation claim against Fay on the September 8, 2000, final report he signed, along with two other employees of the Payne Firm, on behalf of his employer.  Given that it is stated therein that Lexington Manor is suitable for development, none could argue that it does not contain false information.  Nevertheless, Fay argues that he is entitled to summary judgment on the Plaintiff's claim of negligent misrepresentation, because he was not in privity of contract with the Plaintiff.  See Doc. #94 at 20.  However, since privity of contract is not a requisite for a claim of negligent misrepresentation under the law of Ohio (see Haddon View, supra), this Court rejects Fay's contention that he is entitled to summary judgment on this claim.

Accordingly, the Court sustains the Payne Firm Defendants' Motion for Summary Judgment (Doc. #94), as it relates to the Plaintiff's and Thomas Defendants' negligence claims against all Payne Firm Defendants and the Plaintiff's claims of negligent misrepresentation against John Payne.  The Court overrules that motion as it relates to Ryland's and the Thomas Defendants' claims of negligent misrepresentation asserted against the Payne Firm and Plaintiff's claim of negligent misrepresentation against Fay.


Counsel will note that the Court has scheduled a telephone conference call on Wednesday, March 12, 2008, at 4:30 p.m.  During that call, the Court will

establish procedures for mediation, as well as establishing a trial date and other

dates leading to the conclusion of this litigation.


March 11, 2008


                                        /s/ Walter Herbert Rice
                                    _____
                                     WALTER HERBERT RICE, JUDGE
                                     UNITED STATES DISTRICT COURT

Copies to:
Counsel of Record.